## HOKE ET AL. *v.* JACKMAN, EXECUTOR, ET AL.

[No. 22,555. Filed December 15, 1914.]

1. WILLS.—*Construction.—Presumptions.—Use of Words.*—It is always presumed that words used by a testator were used in their strict and primary acceptance, unless a contrary intent appears from the context of the will, in which case they will be construed in accordance with the sense in which he appears to have used them. p. 539.

2. WILLS.—*Construction.—Use of Words.*—Where there is nothing in the context of a will to show that words were used therein in any other than their strict and primary sense, and the words so interpreted are sensible with reference to extrinsic circumstances, they will be interpreted in their strict and primary sense, even though they are capable of some secondary interpretation and the most conclusive evidence of an intent to so use them is tendered. p. 539.

5. WILLS. — *Construction. — Use of Words. — Extrinsic Circumstances.*—Where nothing appears from the context of a will to show that words therein were used in any other than their strict and primary sense, if such interpretation renders them insensible with reference to extrinsic circumstances, the court may look to such extrinsic circumstances to determine if any secondary meaning of which they are capable is sensible with reference thereto. p. 540.

4. WILLS.—*Construction.—"Heirs".*—In its broad primary legal sense, the word "heirs" means those who are entitled by law to succeed to the property of an intestate, but in a secondary and more general sense it means those upon whom property devolves on the death of another, either by law or will. p. 540.

5. WILLS.—*Construction.—"Heirs".*—Where a will, after providing for the conversion of the property of testatrix into money, and bequeathing a certain sum as a trust fund for the care of her cemetery, made specific bequests to certain named persons, without indicating in any way what, if any, relation she bore to them, and then provided that in the event there was any money left it should be equally divided among all the "heirs"

named, and that in the event any of the "heirs" named in any way contested the will, "such heir or heirs shall receive nothing and the share of such heir or heirs shall be divided equally among the balance named and among those who do not contest the will", it was apparent that the word "heirs" was not used in its primary sense, but that she meant thereby all the persons named as legatees, although outside the will it was shown that some of the legatees would have been heirs had she died intestate, while others would not have been.  p. 540.

From Wells Circuit Court; *William H. Eichhorn,* Judge.

Action by Clifford Jackman, executor of the last will of Elizabeth J. Best, deceased, against Harta Hoke and others to procure a construction of the will.  From a judgment construing the will, Harta Hoke and others appeal.  *Affirmed.*

*C. K. Lucas, George M. Eberhart, C. W. Watkins,* and *J. W. Moffitt,* for appellants.

*Emmett O. King, Abram Simmons* and *Frank C. Dailey,* for appellees.

Cox, J.—This was a proceeding instituted in the lower court by appellee Jackman executor of the last will of Elizabeth J. Best, deceased, to procure a construction of the will. After providing for the payment of funeral expenses and such debts as might be left by the testator, the will provided that the executor should sell all of the real estate of the testatrix and that the amount derived therefrom together with all of her remaining personal property should be divided as provided in separate following items of the will. By the third item $1,000 was set aside as a trust fund to insure the care of a family cemetery lot.  Over this item there is no controversy.  The proper construction of the following items of the will was sought.

"Fourth.  I hereby give and bequeath to Harmon W. Stults, Catherine A. Sprinkle and David C. Stults, the sum of One Thousand Dollars ($1,000.00) each.  Fifth. I give and bequeath to Amanda J. Howenstine the sum of Nine Hundred Dollars ($900.00).  Sixth.  I give and bequeath to Mary Elizabeth Wagner, Elizabeth J.

Best Dailey, of Omaha, Nebraska, Emma J. Stults, Mertis Howenstine, Nota Howenstine, Harta Hoke and Bessie Carnes, the sum of Five Hundred Dollars ($500.00) each. Seventh. In the event there is any money left after all expenses and the foregoing bequests have been paid, then and in that event the surplus is to be equally divided among all the heirs named. Eighth. In the event that any of the heirs named in this, my last will and testament, contest in any manner the provisions of this will then and in that event such heir or heirs shall receive nothing and the share of such heir or heirs shall be divided equally among the balance named and among those who do not contest this will.''

The doubt as to the proper distribution of the estate which it was sought to have resolved, involved only the residuary estate disposed of by item seven of the will. The lower court found the intention of the testatrix to be that the legatees named in the fourth, fifth and six items should take the residuary estate in equal portions. It is to be noted that there is not, within the four corners of the will, anything to indicate that any of those to whom bequests were made by items fourth, fifth and sixth of it sustained to the testatrix any relation other than that of legatees. No relation of kinship appears. But upon the issues formed in the proceeding the court in response to requests by both parties found the facts specially and from this finding it appears that the legatees named in the fourth and fifth items of the will were brothers and sisters of the testatrix; that of the legatees named in the sixth item Mary Elizabeth Wagner was a daughter of Catharine A. Sprinkle, legatee named in the fourth item, Mertis Howenstine and Nota Howenstine were respectively son and daughter of Amanda J. Howenstine, legatee named in the fifth item, Bessie Carnes was a daughter of David C. Stultz, legatee named in the fourth item, Harta Hoke was the daughter of a brother of testatrix whose death had preceded that of testatrix, Emma J. Stults was a first cousin of testatrix and Elizabeth J. Best Dailey was a cousin in the sixth degree to testatrix, and was her namesake.

At the time her will was made and at the time of her death Elizabeth J. Best was a widow with neither a child, nor the descendant of any child, nor father or mother living. It appears, therefore, that among those named as legatees, the brothers and sisters of testatrix named in the fourth and fifth items of the will and Harta Hoke mentioned in the sixth item, the daughter of a brother of testatrix whose death had occurred before hers, would have shared in the distribution of her estate if she had died intestate. None of the others named as legatees would have been entitled to a share under the statute governing the descent and distribution of the estates of persons who die intestate in this State. §2993 Burns 1914, §2470 R. S. 1881. It also appears that there survived the testatrix another niece and another nephew who were the children of a brother and a sister of hers whose death had preceded hers. Appellant's position is that the primary legal meaning of the word "heirs" as used in the will being sensible and consistent with these extrinsic facts and circumstances that meaning must be given to it.

There are certain settled rules which have been established for the correct interpretation of wills the application of which it is apparent that appellants are invoking for the overthrow of the lower court's interpretation of the will before us. The following has been long recognized as a correct statement of these rules: "A testator is always presumed to use the words in which he expresses himself according to their strict and primary acceptation, unless from the context of the will it appears that he has used them in a different sense; in which case the sense in which he thus appears to have used them will be the sense in which they are to be construed. Where there is nothing in the context of the will, from which it is apparent, that a testator has used the words in which he has expressed himself in any other than in their strict and primary sense, and where his words so interpreted are *sensible with reference to extrinsic circumstances,* it is an

inflexible rule of construction, that the words of the will shall be interpreted in their strict and primary sense, and in no other, although they may be capable of some popular or secondary interpretation, and although the most conclusive evidence of intention to use them in such popular or secondary sense be tendered. Where there is nothing in the context of a will, from which it is apparent that a testator has used the words in which he has expressed himself in any other than in their strict and primary sense, but his words, so interpreted, are *insensible with reference to extrinsic circumstances,* a court of law may look into the extrinsic circumstances of the case, to see whether the meaning of the words be sensible in any popular or secondary sense, of which, with reference to these circumstances, they are capable.'' Wigram, Wills (2d Am. ed.) 55, 56; *Daugherty* v. *Rogers* (1889), 119 Ind. 254, 20 N. E. 779, 3 L. R. A. 847. In its broad primary legal sense the word ''heirs'' means those who are entitled by law to succeed to the property of a decedent if no will is left. A secondary and more general meaning of the word is those upon whom property of any kind devolves on the death of another, either by law or will. Century Dict. 2773; 40 Cyc. 1459, 1461.

It appears to be the theory of counsel for appellants that the will before us contains nothing to indicate that the testatrix used the word ''heirs'' in any other than its legal sense; that as the will itself does not show that the persons named in the will bore any relation to the testatrix other than that of legatee it was necessary to resort to extraneous facts to discover that relation and to determine finally whether the word ''heirs'' was used in its primary legal sense or with a secondary meaning; that if the relation thus uncovered showed kinship of any of the legatees to the testatrix in an inheritable degree under the statute governing the descent and distribution of property of intestates then it must be conclusively presumed that the

word "heirs" was used in its strict legal sense and that such only of the legatees as would have taken under the law can take under the residuary clause of the will; and finally that if none of the legatees when their relation to the testatrix was so disclosed had been of her inheritable kin then the primary meaning of the word "heirs" would have to be excluded and the secondary one adopted. All this of course would correctly follow as stated and the rules of interpretation above set forth would be applicable if the premise of counsel that there is nothing in the context of this will to indicate that the word was used in the secondary sense could be taken as sound. Such an assumption is without warrant. Rules of construction, as do those above stated, always contain the saving clause "unless a contrary intention appear by the will". Schouler, Wills and Administration §462, note 3. The plain and unambiguous words of the will when they disclose the intention of the testator must prevail and can not be controlled or qualified by any conjectural or doubtful construction growing out of the situation, circumstances or condition of the testator, his property or the natural objects of his bounty. Schouler, Wills and Administration §§466, 467 and authorities cited in note 2. So the testatrix had the undoubted right to be the interpreter of her own will and she used words in it adequate to effect that purpose. In such case technical rules give way before the intent made manifest by the language used. The context reveals with reasonable certainty that the testatrix used the word "heirs" in the residuary clause in the secondary sense of legatees. That she intended to dispose of all of her estate by will is clear. The second item directed the division of *all* of her property "as hereinafter set forth". The items of the will following this one show that after the provision for the care of the cemetery lot she selected the objects of her bounty and pointed them out by the words of the will as certain persons with nothing to indicate that her bounty was in any way influenced by considerations of inheritable

kinship. The seventh item, the residuary clause, when considered with that part of the will preceding it, fairly shows that she intended to leave all of her estate as provided in those items and thought that probably the bequests thus made by her to those she and not the law, had made her "heirs" would consume her estate. Nothing in the words used indicates that she knew that there would be a residue after the payment of the bequests made. But as an afterthought linked with her fairly apparent purpose to dispose of all of her estate to those named by her the seventh item embodies the precaution to dispose of a possible residuum in equal portions to all of the identical persons to whom she had, in the preceding items, shown an intention of bequeathing what would probably be all of her estate remaining after the payment of debts and the sum devoted to the care of the cemetery lot. The words "give and bequeath" are omitted from the residuary clause. It borrows them from the preceding item and includes all the legatees named. The words used "in the event there is any money left after all expenses and the foregoing bequeaths have been paid, then and in that event the surplus is to be equally divided among all the heirs named" manifests a clear intention in the mind of the testatrix to translate her own will and to make and point out her own residuary legatees and not to leave the discovery of who they were to be made by the light of extraneous facts and a rule of construction. The words embody the clearest notice that the testatrix had named her heirs and that among all of them and not a part of them a possible residue of her estate should be equally divided. It can not readily be believed that immediately after carrying out an intention of disposing of all her estate by bequeathing definite sums to various named persons without a word of relationship expressed, testatrix had any thought whatever in the words used of separating some unidentified ones of them from the others and to bestow upon them a possible residuary estate. Even if all this were not enough to show

that the context of the will exhibits an intention on the part of the testatrix to use the word "heirs" in its secondary sense of legatees, the provision of item eight in the nature of a condition *in terrorem* should remove all doubt and establish such an intention conclusively. It is aimed at "any of the heirs named" who "contest *in any manner*" the provisions of the will and provides that any such contesting heir shall forfeit his share which "shall be divided equally among the balance named and among those who do not contest this will." The condition against contest is broad and comprehensive—"in any manner". The testatrix wanted her will to stand as she had written it. A legatee who was not an "heir" in the primary sense might in a proceeding to construe the will question the validity of some provision which would affect his interest. And in the narrower sense of the word "contest" a mere legatee not an "heir" in the primary sense may sometimes contest. *Clear Spring Tp.* v. *Blough* (1909), 173 Ind. 15, 25, 88 N. E. 511, 89 N. E. 369; *Holmes* v. *Campbell College* (1912), 87 Kan. 597, 125 Pac. 25, Ann. Cas. 1914 A 475, 41 L. R. A. (N. S.) 1126, note. There can be no doubt that the testatrix did not lay this condition against contest only on such of those named as legatees as were "heirs" in the primary sense and not on the others.

The conclusion which was reached in the trial court that the testatrix used the word "heirs" in the secondary sense of legatees is manifestly a correct interpretation of her intention as it appears from the will itself. Where the words of a will show that a testator intended to use the word heirs in a secondary or popular sense effect must be given to his intention. Technical words used in a will are liable to other explanatory and qualifying expressions in the context; and where a different meaning is fairly deducible from the whole will, the technical sense must bend to the apparent intention. Schouler, Wills and Administration §470; 40 Cyc. 1459, 1461 and cases there cited; *Eisman* v. *Poindexter* (1876),

52 Ind. 401; *In re Hull's Will* (1900), 30 Misc. 281, 63 N. Y. Supp. 725; *In re Estate of Widmeyer* (1897), 28 Pitts. Leg. J. 208. In the latter case it was said: "It is clear that the question whether the residuary estate shall be divided amongst the class whom testator had already made 'heirs' of the bulk of his estate, or only amongst those who were within the statute of distribution, is one of intention. The use of technical terms will readily yield when this has once been discovered. It is conceded that the word 'heirs' is primarily applicable to the disposition of realty, but when used with reference to personalty becomes plastic in its meaning, and may or may not refer to the statute of distribution, as the context indicates. * * * Analysis will show that it was used here in the sense of heirs made rather than next of kin. The description of the residuary legatees was obviously local and personal in character. The terms in which the gift was made implied a means of identification previously given in the will itself. It was to 'all the aforesaid heirs herein mentioned'." See, also, *Shapleigh* v. *Shapleigh* (1899), 69 N. H. 577, 44 Atl. 107; *Kayhart* v. *Whitehead* (1910), 77 N. J. Eq. 12, 14, 76 Atl. 241.

As we have reached the conclusion that it appears from the will itself that the testatrix intended to use the word "heirs" in the residuary clause as meaning legatees it becomes unnecessary to consider the question raised by appellants on the action of the trial court in permitting the scrivener of the will to testify that the maker of the will said to him that she was making all of those named as legatees her heirs and wanted the surplus if any divided equally among them. As a correct interpretation of the will was reached this testimony was in any event harmless if. which we do not decide, it was erroneous.

The judgment is affirmed.

NOTE.—Reported in 107 N. E. 65. As to when extrinsic evidence may be admitted to remove ambiguities in wills, see 58 Am. Rep. 74. See, also, under (1, 2, 3) 40 Cyc. 1396; (4) 21 Cyc. 411, 416.